UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
——

| | | |
|---|---|---|
| CHARLES DEO HYDE, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:05-cv-39 |
| | ) | |
| v. | ) | Honorable Gordon J. Quist |
| | ) | |
| KENNETH McKEE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a term of twenty-five to forty years of imprisonment, imposed by the Kent County Circuit Court on October 25, 2001, after he was convicted by a jury of second-degree murder, MICH. COMP. LAWS § 750.317. As stated verbatim from his *pro se* petition, Petitioner raises the following three grounds for habeas corpus relief:

> I. THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO PRESENT A DEFENSE BY REFUSING TO GIVE A REQUESTED INSTRUCTION ON INVOLUNTARY MANSLAUGHTER AS A LESSER OFFENSE OF SECOND DEGREE MURDER, WHERE THERE WAS EVIDENCE THAT THE DEATH WAS AN UNINTENDED RESULT OF AN ASSAULT AND BATTERY THAT WAS COMMITTED WITHOUT INTENT TO KILL OR TO DO GREAT BODILY HARM.

> II. MR. HYDE'S CONVICTION FOR SECOND DEGREE MURDER VIOLATES HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO BE FREE FROM CONVICTION IN THE ABSENCE OF PROOF OF GUILT BEYOND A REASONABLE DOUBT.

> III. DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO OBJECT TO THE ADMISSION OF AUTOPSY PHOTOGRAPHS THAT WERE INADMISSIBLE, FAILED TO OBJECT TO THE ADMISSION OF EVIDENCE THAT WAS ALLEGEDLY REMOVED FROM THE CRIME SCENE A WEEK AFTER THE CRIME, AND

WHERE COUNSEL PLEAD [SIC] DEFENDANT GUILTY TO THE COURT
AND JURY WITHOUT DEFENDANT'S CONSENT. (Procedurally defaulted)

Respondent has filed an answer to the petition (docket #7) contending that the petition should be

denied. Upon review and applying the standards of the Antiterrorism and Effective Death Penalty

Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), I find that Grounds I, II, and III are without merit.

Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the death of Vicki Harig in Grand Rapids, Michigan

on January 1, 2001.  Petitioner was charged with second-degree murder.  He was tried before a jury

on August 12, 2001 through August 21, 2001.[1]

Ms. Harig's mother, Virginia Maguire, testified that on December 30, 2000, she and

a friend were living in a first level apartment on Hamilton Street, Grand Rapids, Michigan, and Ms.

Harig and Petitioner were living in the second level apartment in the house.  (Tr. II, 115-17).

December 30, 2000 was Ms. Harig's fifty-first birthday.  Mrs. Maguire telephoned Ms. Harig at

approximately 11:30 a.m. and suggested that they go to the Sons and Daughters Hall for a drink.

(Tr. II, 118-19).  Mrs. Maguire, Ms. Harig and Petitioner went to the Hall, and stayed until

approximately 3:00 p.m.  (Tr. II, 121).  None of the three were intoxicated when they left. (Tr. II,

---

[1]The trial transcripts will be identified as follows:

August 14, 2001  Tr. I
August 15, 2001  Tr. II
August 16, 2001  Tr. III
August 20, 2001  Tr. IV
August 21, 2001  Tr. V

121). The parties returned to their respective apartments. (Tr. II, 122). Ms. Harig did not appear to have any injuries at that time. (Tr. II, 132). Later that evening, around 6:30 or 7:00 p.m., Petitioner came to Mrs. Maguire's apartment and asked if she needed anything from the store as he was going to buy beer. She requested a lotto ticket. (Tr. II, 123). Shortly after Petitioner returned and gave Mrs. Maguire the lotto ticket, Mrs. Maguire telephoned Ms. Harig to report she had won ten dollars. (Tr. II, 123). Around 9:30 or 10:00 p.m., Mrs. Maguire heard "punking" on the floor of Ms. Harig's apartment. (Tr. II, 123). By 10:30 or 11:00 p.m., the "punking" stopped. (Tr. II, 124). Mrs. Maguire was not concerned because she thought Petitioner and Ms. Harig might have company. (Tr. II, 125). Other than the "punking" sound, she did not hear any noises of distress such as screaming or crying. (Tr. II, 125, 141). Mrs. Maguire went to bed at 1:00 a.m. and heard nothing further that night. (Tr. II, 125). At 1:00 p.m. on December 31, 2000, Sue Ward telephoned Mrs. Maguire and asked what was wrong with Ms. Harig. (Tr. II, 125). Mrs. Maguire went upstairs as fast as she could. Ron [Ward] passed her on his way up the stairs. (Tr. II, 126). Mrs. Maguire entered Ms. Harig's apartment and found her daughter lying on a love seat. (Tr. II, 131). Ms. Harig appeared to have been beaten, and she was having difficulty breathing. (Tr. II, 131). Petitioner said, "I must have done it. I don't remember." (Tr. II, 131). Ron called 9-1-1. (Tr. II, 131).

Thomas R. Gustinis was the bar manager at the Sons and Daughters Hall. (Tr. II, 145). He observed Mrs. Maguire, Ms. Harig and Petitioner seated at the bar of the Hall on December 30, 2000, and they were still there when he left at 5:00 p.m. (Tr. II, 147). They did not appear to be intoxicated, and he did not see them arguing at any time. (Tr. II, 147). Ms. Harig did not have any visable injuries. (Tr. II, 148).

Michael Magnotta, also a bartender at the Sons and Daughters Hall (Tr. II, 151), arrived at the Hall on December 30, at 4:15 p.m.  Ms. Harig and Petitioner were sitting at the bar, but he did not recall if Mrs. Maguire was there.  (Tr. II, 152).  They appeared to be having a good time, there was no arguing, and Ms. Harig did not have any apparent injuries. (Tr. II, 152).  They left at approximately 4:30 p.m. (Tr. II, 153).

Krystal Hyde, Petitioner's daughter (Tr. II, 155), testified that at approximately 6:30 p.m. on December 30, she telephoned Petitioner and asked to borrow twenty dollars to go to a New Year's Eve skating party.  Petitioner agreed to loan her the money. (Tr. II, 155).  She arrived at Ms. Harig's apartment shortly thereafter (Tr. II, 156), and knocked on the door for almost five minutes. (Tr. II, 156).  Although she did not hear any noise inside the apartment, she knew Petitioner was there.  (Tr. II, 157).  Finally, she heard Petitioner say, "get up, bitch,"  (Tr. II, 157), but he did not sound angry.  (Tr. II, 168).  He then opened the door and Ms. Hyde followed him into the living room.  (Tr. II, 157).  She observed Ms. Harig in front of a chair on her knees trying to climb onto the chair. (Tr. II, 159).  Ms. Harig had some redness under one eye (Tr. II, 160), but otherwise appeared normal.  (Tr. II, 160).  She was not crying. (Tr. II, 170). The condition of the living room appeared normal.  (Tr. II, 168).  Petitioner was angry about Ms. Hyde's request for money, and went into the bathroom and shut the door.  (Tr. II, 162).   Ms. Hyde believed Petitioner was intoxicated by the way he was talking and walking.  (Tr. II, 164).  Ms. Hyde observed Ms. Harig walk into the kitchen and stumble around. (Tr. II, 164).  On other occasions, Ms. Hyde had seen both Ms. Harig and Petitioner intoxicated. (Tr. II, 166).  Ms. Hyde did not have a conversation with Ms. Harig, and she left after five minutes.  (Tr. II, 163).

4

Ron Ward testified that he has been Petitioner's friend for almost thirty years. (Tr. II, 173). At approximately 1:00 p.m. on December 31, 2000, Mr. Ward received a telephone call from Petitioner reporting that Ms. Harig looked as if she had been beaten and he could not wake her up. (Tr. II, 175). Five minutes later, Mr. Ward arrived at Ms. Harig's apartment. (Tr. II, 175). He passed Mrs. McGuire going up the steps. (Tr. II, 175). Petitioner was at the door waiting, and Ms. Harig was lying on a love seat. (Tr. II, 175-76). Mr. Ward observed that her face was bruised (Tr. II, 176), and she was having trouble breathing. (Tr. II, 178). Mr. Ward telephoned 9-1-1. (Tr. II, 177-78). Petitioner repeatedly stated that he must have caused the injuries but could not remember anything. (Tr. II, 180). Mr. Ward noticed blood stains in the living room, and unidentified brown spots in the kitchen.  (Tr. II, 183-85.)

Officer Paul Johnson of the Grand Rapids Police Department testified he was dispatched to the Hamilton Street address on December 31, 2000, at approximately 2:00 p.m. (Tr. II, 191). He observed that Ms. Harig's face was "real bruised purple" (Tr. II, 192), but he did not notice any blood. (Tr. II, 202). Ms. Harig's slippers were in the stairwell. (Tr. II, 197) Officer Johnson searched for, but did not find, any blood in the apartment or the stairwell. He questioned Petitioner, who reported that when he awoke the entry door was unlocked, there was no sign of forced entry, and nothing appeared to have been stolen. (Tr. II, 199). Petitioner told Officer Johnson that he was not certain what had happened. When he awoke he found Ms. Harig lying on the kitchen floor near a bowel movement.  Because he could not waken her, he carried her to the bedroom and placed her on the bed.  When she vomited, he picked her up and placed her on the love seat in the living room. (Tr. II, 174).  Officer Johnson observed a case of beer with eight cans of beer missing, and a bag full of empty beer cans. (Tr. II, 200).  On cross-examination, Officer Johnson acknowledged that he

could not rule out the possibility that the bruising on Ms. Harig's face was caused by a fall. (Tr. II, 202).

Detective John Bylsma of the Grand Rapids Police Department testified that Ms. Harig had been taken to the hospital by the time he arrived at the scene. He observed food on the floor, table, chairs, and lower wall in the kitchen. (Tr. IV, 325-28). He also noted bowel movements on the floor in various locations, and stains on the bedspread. (Tr. IV, 329).

Doctor Steven Ottenweller testified that he was the trauma surgeon on duty when Ms. Hargis arrived at the hospital. She was comatose (Tr. III, 240), and her face was bruised. (Tr. III, 241). The doctor found blood at the back of her mouth and throat (Tr. III, 242), which could be caused by bleeding from the nose. (Tr. III, 247). No injuries to her chest, cervical spine or pelvis were discovered. (Tr. III, 242-43). A CAT scan revealed a subdural hematoma [blood clot] the approximate size of a baseball on the left side of Ms. Hargis's brain. (Tr. III, 243). Doctor Ottenweller opined that the hematoma would be at the top of the severity scale (Tr. III, 245), and generally would not be caused by someone falling down a typical flight of stairs. (Tr. III, 246). It was more consistent with an automobile accident or falling more than twenty feet. (Tr. III, 250). The injury could be caused by a blow to the head by a blunt object, including a fist, but unlikely to occur from a single blow. (Tr. III, 250). Because there was bruising on both of Ms. Harig's cheeks, Doctor Ottenweller concluded she sustained multiple blows to her face. (Tr. III, 257-58). Although the hematoma was successfully removed surgically, Ms. Harig's condition did not improve. (Tr. III, 255). Ms. Harig subsequently died on January 1, 2001.

Doctor Stephan Cohle, a forensic pathologist (Tr. III, 262), also testified for the prosecution. On January 3, 2001, Dr. Cole performed an autopsy on Ms. Harig. (Tr. III, 267). Ms.

6

Harig had extensive bruising on both sides of her face (Tr. III, 270), and her chest (Tr. III, 276), which were the result of multiple blows by a blunt instrument (Tr. III, 273), which could be a fist. (Tr. III, 265). There was also bruising on Ms. Harig's arms (Tr. III, 276-78), which were caused by being grabbed with a great deal of force. (Tr. III, 279). Dr. Cole concluded that the bruising on the backs of Ms. Harig's hands were defensive injuries. (Tr. III, 285). The pattern of injuries was more consistent with an assault than with a fall. (Tr. III, 293-94).

Ms. Harig's daughter, Michelle Shields, testified that approximately a week after her mother's death, she went to her mother's apartment to clean. He mother's chair was covered with some type of food; several rugs on the kitchen floor were covered with stains; and there was a bowel movement in front of the toilet. (Tr. III, 212-14). In the laundry basket, she discovered her mother's blood-covered shirt (Tr. III, 214), which she turned over to the police. (Tr. III, 219).

Ms. Shield's husband, Mark Shields, testified that he helped his wife clean Ms. Harig's apartment. (Tr. III, 224) He found Petitioner's broken watch behind a space heater, which was also turned over to the police. (Tr. III, 227). On numerous occasions, Mr. Shields had seen both Ms. Harig and Petitioner drink alcoholic beverages in excess (Tr. III, 232), but never saw Petitioner become abusive when intoxicated. (Tr. III, 234).

Ann Hunt, who is employed with the Michigan State Police DNA unit (Tr. III, 340) testified that based on her testing of cellular matter on Petitioner's watch, she concluded that both Ms. Harig and Petitioner's DNA was on the watch. (Tr. III, 369). Ms. Harig was the only donor of the blood found on her shirt. (Tr. III, 357).

At the conclusion of testimony, defense counsel requested that the court include a jury instruction on the lesser included offense of involuntary manslaughter. (Tr. IV, 381). The court

7

denied the request, reasoning that the repeated blows delivered to Ms. Harig over a lengthy period of time would not support an involuntary manslaughter instruction. (Tr. IV, 389).

During closing argument, defense counsel argued that there was no evidence that Petitioner intended to kill Ms. Harig or cause her serious bodily harm. Counsel stated:

> Now, a lot of what [the prosecutor] said is true, and I'm not going to sit up here and tell you that this woman was killed by any other means except what was told you, but what you have to decide–ultimately is you have to decide the issue of intent.

(Tr. V, 428).  During its closing argument, the prosecution argued in part:

> This didn't happen by accident.  Five blows to the face, nine blows to the body are all – jeez, woops, I stumbled into her.
> . . .
> It's not a plan.  A plan is first degree murder.  We're not arguing that. Intent can happen in an instant.  He just wanted to beat the crud out of her, and that's what he did.

(Tr. V, 438-40).

On August 21, 2001, the jury found Petitioner guilty of second degree murder (Tr. V, 455-57).  On October 25, 2001, Petitioner was sentenced to a term of imprisonment of twenty-five to forty years.  (Sentencing Tr., 7-8, docket #17.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His appellate counsel raised the issues of failure to instruct the jury on involuntary manslaughter and sufficiency of the evidence.  In a *propria persona* brief, Petitioner raised the issue of ineffective assistance of trial counsel for failing to object to the admission of Ms. Harig's autopsy photographs, Ms. Harig's blood covered shirt, and Petitioner's broken watch; and further, for conceding that Ms. Harig most likely died as a result of Petitioner's actions. On June 19, 2003, the Michigan Court of Appeals

issued an unpublished opinion affirming Petitioner's conviction. (*See* 6/19/03 Mich. Ct. App. Opinion (MCOA Op.), docket #18.)  Without benefit of counsel, Petitioner filed an application for leave to appeal in the Michigan Supreme Court.  Rather than grant Petitioner's application for leave to appeal, the Michigan Supreme Court issued an order on December 29, 2003, vacating in part the judgment of the court of appeals and remanding the case to the court of appeals for reconsideration of Petitioner's argument that the circuit court erroneously refused his request to instruct the jury on involuntary manslaughter in light of *People v. Mendoza*, 664 N.W. 2d 685 (2003).  (*See* 12/29/03 Mich. Order, docket #19).

On March 25, 2004, the Court of Appeals considered this case in light of *Mendoza*, and again affirmed Petitioner's conviction. (*See* 3/25/04 MCOA Op. on Remand, docket #18).  On August 31, 2004, the Michigan Supreme Court denied Petitioner's application for leave to appeal for lack of merit in the grounds presented.  (*See* 8/31/04 Mich. Order, docket #20)**.**

## Standard of Review

This action is governed by the AEDPA.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, No 05-1167, 2006 WL 639150 (U.S. June 12, 2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

9

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result, (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case, or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at

411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

**Discussion**

### A.      Ground I: Jury Instruction

Petitioner argues that the trial court erred in refusing to give a jury instruction on involuntary manslaughter as a lesser included offense of second degree murder where the evidence showed that Ms. Harig's death was the result of an assault and battery that was committed without the intent to kill or do great bodily harm.  The Michigan Supreme Court remanded the case to the Michigan Court of Appeals to reconsider Petitioner's jury instruction claim in light of *People v. Mendoza*, 664 N.W. 2d 685 (2003).  Upon remand, the Michigan Court of Appeals concluded that a jury instruction on involuntary manslaughter was not warranted by the evidence.  The court reasoned:

> At trial in this matter, defendant requested a jury instruction for the lesser offense of involuntary manslaughter.  The trial court denied defendant's request citing the lack of evidence to support the charge. The decedent's death arose from a beating, which persisted over a

11

significant period of time and involved repeated severe blows to the head. The evidence showed that the death did not arise from a simple assault and battery, and therefore, an instruction for involuntary manslaughter was insupportable.

. . .

Upon reconsideration, we affirm our previous ruling affirming the trial court's denial of defendant's requested jury instruction. Although involuntary manslaughter is a necessarily included lesser offense of murder, a rational view of the evidence does not support an instruction for that charge. Defendant's violent acts of aggression had a natural tendency to cause great bodily harm. The evidence showed that the death was caused by a severe and prolonged beating, not by a single blow or an accidental fall. The evidence showed that defendant continued his assault even after Ms. Harig was unable to stand. Based on this evidence, an instruction for involuntary manslaughter was not warranted.

(MCOA Op. on Remand at 2-3).

It is well settled that "state-law violations provide no basis for federal habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 67-68 n.2 (1991); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000). It is not the "province of the federal court to reexamine state court determinations on state law questions." *Estelle*, 502 U.S. at 67-68. "On habeas review, the court is bound by state court interpretations of state criminal law except in extreme circumstances where it appears that the interpretation is an obvious subterfuge to evade consideration of a federal issue." *Warner v. Zent*, 997 F.2d 116, 133 (6th Cir. 1993). Within broad constitutional limits, a state has discretion to determine the elements of its own crimes and defenses. *See Patterson v. New York*, 432 U.S. 197, 210 (1977); *Warner*, 997 F.2d at 133. The United States Supreme Court held in *Beck v. Alabama*, 447 U.S. 625 (1980) that a defendant in a capital case was denied due process where the jury was not permitted to consider a lesser offense warranted by the evidence. *Id.* The Supreme Court specifically noted it was not deciding whether the due process clause required a jury instruction on

a lesser included offense in a noncapital case. *Id.* at 237 n.14.  With respect to noncapital cases, the Sixth Circuit has held that where "the highest court of a state has reviewed a defendant's request for a lesser included offense instruction and concluded that it is not warranted by the evidence elicited at trial, that conclusion is axiomatically correct, as a matter of state law."  *Bagby v. Sowders*, 894 F.2d 792, 795 (6th Cir. 1990); *accord Charlton v. Davis*, 439 F.3d 369, 375 (7th Cir. 2006); *Tata v. Carver*, 917 F.2d 670, 671 (1st Cir. 1990); *Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir. 1988); *Valles v. Lynaugh*, 835 F.2d 126, 127 (5th Cir. 1988);  *Perry v. Smith*, 810 F.2d 1078, 1080 (11th Cir. 1987).  While the *Bagby* court noted that it is conceivable that a jury instruction claim "might be cognizable upon federal habeas corpus review where a fundamental miscarriage of justice is found to have resulted from the arbitrary and unsupportable denial of a lesser included offense instruction in clear defiance of state law," *id.,* it held that a state court's failure to instruct the jury on a lesser included offense in a noncapital criminal case is not such a fundamental defect. *Id.* at 797 (citations omitted).

Under Michigan law, if a homicide "was committed with a lesser mens rea of gross negligence or an intent to injure, and not malice, it is not murder, but only involuntary manslaughter." *People v. Holtschlag,* 684 N.W. 2d 730, 742 (2004). "Malice is defined as 'the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm."  *People v. Werner,* 659 N.W. 2d 688, 692 (2002) (citation omitted).  The Michigan Supreme Court held in *Mendoza* that because involuntary manslaughter is a necessarily included lesser offense of murder, an instruction on involuntary manslaughter must be given, but only if supported by a rational view of the evidence.  *Mendoza,* 664 N.W. 2d at 693.  Accordingly,

considering the evidence elicited at trial, I conclude that the Michigan Court of Appeals' resolution of this claim is neither contrary to nor an unreasonable application of clearly established federal law.

### B.        Ground II: Insufficient Evidence

As his second ground for relief, Petitioner claims that there was insufficient evidence to establish guilt beyond a reasonable doubt where the evidence showed that he was intoxicated on the evening of December 30, 2000 and the early morning of December 31, 2000, and therefore, could not form the necessary intent.

A § 2254 challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Under Michigan law, second-degree murder requires proof of "malice," which is defined as "the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause

14

death or great bodily harm." *Werner*, 659 N.W.2d at 692.  The Michigan Court of Appeals considered and found significant Ms. Harig's injuries consistent with defensive wounds; her injuries consistent with blunt force blows; Ms. Hyde's testimony that she heard Petitioner tell Ms. Harig to "get up, bitch;" and Ms. Hyde's observation that Ms. Harig was struggling to get off the floor into a chair. The court stated:

> The offense of second-degree murder does not require an actual intent to harm or kill, but only the intent to do an act that is in obvious disregard of life-endangering consequences. . . .On this record, we find that a reasonable trier of fact could conclude that defendant was guilty of second-degree murder.

(MCOA Op. at 2, internal citations omitted).  The facts provide sufficient evidence for a rational trier of fact to find that petitioner intended to repeatedly strike Ms. Harig over an lengthy period of time, which could likely cause death or great bodily harm.  Accordingly, I conclude that Petitioner is not entitled to relief because the finding of the Michigan Court of Appeals was not an unreasonable application of established federal law in light of the evidence.

### C.        Ground III:  Ineffective Assistance of Counsel

As his third ground for habeas relief, Petitioner argues that he was denied the effective assistance of trial counsel when his attorney failed to object to the admission of Ms. Harig's autopsy photographs; failed to object to the admission of evidence that was removed from the crime scene a week after the crime; and pleaded Petitioner guilty without Petitioner's consent.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell

below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Id.* at 687-88. However, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one . . . ." *Id.* at 697. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).  A federal court making the "unreasonable application" inquiry must ask "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000); *and see Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (explaining that to be unreasonable, the decision of the state court must not be simply incorrect or erroneous, it must have been "objectively unreasonable.").

16

### 1. Autopsy photographs

Petitioner argues that trial counsel was ineffective for failing to object to the admission of Ms. Harig's autopsy photographs. The Court of Appeals found that the autopsy photographs were properly entered as evidence and, therefore, trial counsel was not ineffective for failing to assert a frivolous objection. The Court of Appeals stated in part:

> With regard to photographs, this Court has generally concluded that: photographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted . . . However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. *People v. Howard*, 226 Mich. App. 528, 549-50; 574 NW 2d 16 (1997).
>
> In the instant case, the admission of the autopsy photographs was proper because they depicted the nature and extent of the decedent's injuries. The probative value of the photographs to show defendant's intent outweighed the danger of unfair prejudice. Moreover, the forensic pathologist explained to the jury that the evidence of medical treatment in the photographs was unrelated to the decedent's original injuries. Thus, we are not persuaded that there was any risk of unfair prejudice by showing the jury these photographs. Because the evidence was relevant and not unfairly prejudicial, any objection would have been futile. Counsel is not required to advocate a meritless position.

(MCOA Op. at 2).

State court evidentiary rulings do not rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *accord Bugh v. Mitchell*, 329 F. 3d 496, 512 (6th Cir. 2003); *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001). This affords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552. Petitioner fails to identify any Supreme Court precedent offended by the introduction

of the autopsy photographs.  The state court decision regarding the admissibility of the photographs was patently reasonable.  Because the photographs were properly admitted, Petitioner's trial counsel was not constitutionally deficient in failing to object.  *See United States v. Sanders*, 404 F.3d 980, 986 (2005) (counsel cannot be ineffective for failing to object to what was properly done); *Harris v. United States*, 204 F.3d 681, 681 (6th Cir. 2000) (failure by counsel to do something that would have been futile is not ineffective assistance); *United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (counsel not ineffective for failing to pursue motions that would have been futile);  *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("failure to raise meritless objections is not ineffective lawyering; it is the opposite.").  Accordingly, I conclude that the state court's decision was not an unreasonable application of *Strickland.*

## 2.  Later discovered evidence

Petitioner contends that his trial counsel was ineffective for failing to object to the introduction of Ms. Harig's blood stained shirt and Petitioner's watch, which Ms. Harig's daughter discovered and removed from the scene a week after the crime.  He argues that there was no evidence that Ms. Harig was wearing the shirt on the day of the crime, and the fact that the items were not found in the initial police search makes them suspect.  The Michigan Court of Appeals concluded:

> We also find no merit to defendant's clam that his counsel erred in failing to object to the admission of the decedent's shirt and defendant's watch into evidence.  The decedent's daughter and son-in-law discovered these items at the crime scene one week after the incident.  The prosecution laid a proper foundation for the admission of both items, and admitted them into evidence through an expert in forensic science who conducted DNA testing on both items. [footnote omitted].  *See People v. Slaton*, 235 Mich. App. 328, 339-340; 354 NW 2d 451 (1981) (admission of this evidence bloodstained shoes proper in murder trial); *People v. Peery*, 119 Mich. App. 207, 211-

18

> 212; 326 N.W.2d 451 (1982) (admission of bloodstained boot proper
> in robbery trial). Thus, an objection to the admission of this evidence
> would have been futile. Again, we note that defense counsel is not
> required to advocate a meritless position. *Snider, supra* at 425.[2]
> Given the overwhelming evidence in this case, defendant has failed
> to establish a reasonable probability that but for his counsel's alleged
> error, the result of the proceedings would have been different.
> *Carbin, supra* at 600.[3]

(MCOA Op. at 3).   Ms. Harig's shirt and Petitioner's watch were admissible under state law, and

a proper foundation for their admission was laid.  Thus, a challenge by counsel to the admission of

the evidence would not have succeeded.  As discussed directly above under "autopsy photographs,"

trial counsel's performance does not fall below an objective standard of reasonableness for failing

to make objections that would have been futile.  *See*, *e.g.*, *Hanley*, 906 F.2d at 1121.  I conclude that

the analysis of the Michigan Court of Appeals is consistent with *Strickland*.

## C.      Guilty plea

Petitioner claims that trial counsel was ineffective because she essentially pleaded

Petitioner guilty without Petitioner's consent.  The Michigan Court of Appeals concluded that

counsel's conduct was a matter of sound trial strategy, stating:

> Defendant ultimately contends that his counsel was ineffective for
> "pleading him guilty."  At trial defense counsel conceded that the
> decedent most likely died because of defendant's actions, but argued
> that defendant did not possess the requisite intent for second-degree
> murder.  While defendant admits that his counsel's statements were
> a form of trial strategy, he claims that he never agreed to such a
> strategy.  A lawyer is not considered ineffective for conceding certain
> points at trial, including conceding guilt of a lesser offense.  Only a
> complete concession of guilt constitutes ineffective assistance of
> counsel.  There was overwhelming evidence in this case indicating
> that defendant severely beat the decedent.  Thus, it is reasonable to

[2]*People v. Snider*, 608 NW2d 502, 238 Mich. App. 393 (2002).

[3]*People v. Carbin*, 633 NW2d 884, 463 Mich. 590 (2001).

19

> conclude that defendant's counsel made a tactical decision to focus his argument on defendant's intent at the time of the crime. This Court will not substitute its judgment for that of trial counsel regarding matters of strategy or assess trial counsel's competence with the benefit of hindsight.

(MCOA Op. at 3-4). A habeas petitioner must overcome a presumption that the conduct of one's counsel was a matter of strategy. *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). Counsel's employment of a trial strategy that was ultimately unsuccessful does not mean that counsel was ineffective. *See Roe v. Flores-Ortega,* 528 U.S. 470 (2000) (an unsuccessful trial strategy will not support a claim of ineffective assistance if the action taken was reasonable at the time); *Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (an ineffective assistance of counsel claim cannot survive as long as counsel's decisions were reasonable, even if mistaken); *Pool v. Perini,* 659 F.2d 730 (6th Cir. 1981) (same); *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001) (same).

Trial counsel conceded that Petitioner likely delivered the fatal blows to Ms. Harig, but argued that Petitioner could not form the requisite intent to harm because of his intoxication. There was overwhelming evidence that Ms. Harig's injuries were consistent with repeated blows, but inconsistent with a fall. There was no evidence of a forced entry into the apartment or that anyone other than Petitioner was present at the apartment after Petitioner's daughter left around 7:00 p.m. Petitioner acknowledged to Mr. Ward and Ms. Harig's mother that he likely caused Ms. Harig's injuries. Petitioner has not shown that in light of the evidence presented at trial counsel's trial strategy of conceding that Petitioner struck Ms. Harig was deficient. I conclude that the decision of the Michigan Court of Appeals constitutes a reasonable application of *Strickland.*

**Recommended Disposition**

For the foregoing reasons, I recommend that Petitioner's habeas corpus petition be denied for lack of merit in the grounds presented.

Dated:  February 26, 2007                    /s/ Hugh W. Brenneman, Jr.
                                             Hugh W. Brenneman, Jr.
                                             United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

21